364 So.2d 952 (1978)
STATE of Louisiana
v.
Melvin WEBER.
No. 62253.
Supreme Court of Louisiana.
November 13, 1978.
*953 A. J. Boudreaux, Indigent Defender Bd., 24th Judicial Dist., Kenner, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Patrick Leitz, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
SANDERS, Chief Justice.
The State charged Melvin Weber with simple burglary, a violation of LSA-R.S. 14:62. The defendant pled not guilty and not guilty by reason of insanity. A jury found him guilty and the court sentenced him to nine-years' imprisonment.
The defendant appeals. He relies on one assignment of error for reversal of his conviction and sentence.
We adduce the following context facts:
As Sergeant Thomas Goscienski and his wife watched television one night, they heard a door slam. Looking through a window, the sergeant saw a black male crouching and sorting through items on the utility room floor. The sergeant put his gun on the man whom he then recognized as Melvin Weber. When he asked Weber what he was doing, he replied, "[g]ee, I must have made a mistake because I used to work around here." The sergeant then arrested him.
The defense's argument challenges the court's ruling declaring him mentally capable or proceeding to trial and the jury's verdict finding him sane at the time of the offense.
Counsel filed a motion for a sanity commission and hearing to determine defendant's present mental capacity to proceed to trial. The reason for his request was that the defendant told him that he did not know he had been arrested or why he had been arrested or incarcerated. The court appointed Dr. DeVillier and Dr. Sanders to examine defendant relative to his capacity to understand the proceedings and to assist in his defense.
Dr. DeVillier's written report contains the following pertinent information gathered concerning an October 18, 1976, interview: The defendant stated that he has worked as a busboy at the Hilton Hotel for all his working life and that he completed the twelfth grade; he denied being hospitalized or receiving any psychiatric treatment; he stated that he had been "picked up" a couple of times, but never stayed in jail; another doctor informed Dr. DeVillier that the defendant may have been hospitalized *954 and was in jail in 1973 and 1975 and was evaluated at those times; the defendant stated that he was presently charged with driving without a license, being intoxicated, and trespassing; the doctor observed a noticeable spasticity of defendant's lower extremity with his gait, but he denied having any problem walking; he was oriented in all spheres and understood his present circumstances; his intelligence is probably of low average range; his thinking seemed very concrete and simple, his affect blunted; he seemed uninterested in supplying accurate answers to the questions. Dr. DeVillier concluded that the defendant had probable simple schizophrenia and that he "would be considered legally sane in that he understands right from wrong and is mentally competent to stand trial since he understands the nature of charges against him and could assist counsel."
Dr. Sanders' written report presents the following pertinent information obtained from and about the defendant on October 4, 1976: The defendant stated that he was charged with receiving stolen property; he was uncommunicative during the examination; he denied any type of mental or medical disorder or problem; he stated that he never worked or attended school; the doctor noticed that he walked with a marked scissor's gait, and the defendant stated that he had no problem walking; he frowned most of the interview; his affect was appropriate and his associations intact; he gave the day of the week as the sixth day of Thursday and the date as August 8, 1974; he could repeat five digits in sequence and could reverse three digits in sequence; rough testing indicated that his IQ is below normal and that he was socially and culturally deprived. Dr. Sanders concluded that the defendant had borderline to mild mental retardation and that he was legally sane "in that he understands the difference between right and wrong in regard to the nature of the act of which he is accused" and "at the time of the commission of the alleged crime and at the present time [he] is legally sane and is able to assist counsel in his defense if explanations are couched in very concrete, simple terms."
At the lunacy hearing, Dr. DeVillier's testimony reflected the information in his report. Both parties stipulated that if Dr. Sanders testified he would testify as to what was in his report. Finding the defendant legally sane and able to assist counsel, the court stated:
"Dr. Sanders corroborates and agrees with Dr. DeVillier that the defendant is legally sane and able to assist counsel and understand the nature of the proceedings against him. They have some limitations on his intelligence, but intelligence is not the criterion for whether you stand trial or not, or we wouldn't have anybody in the jails.
"So, I am going to declare this person as being legally sane and able to assist counsel in his own defense."
At trial, only Sergeant Goscienski testified for the State.
The defense called Dr. DeVillier, whose testimony reflected what was in his written report. He added, however, that the defendant was reluctant to answer his questions, hesitating before he did so. He concluded that the defendant was capable of assisting counsel and of forming specific intent. Dr. Arnesson, an expert in psychiatry, also testified for the defense. She examined the defendant in 1973 and 1975, but not concerning this case. She testified that in 1973 a court declared him legally insane due to his inability to assist counsel and understand the nature of the charges. He was then confined to a mental hospital for treatment of a neurological disease. In 1975, Dr. Arnesson's examination revealed that he was legally sane and able to understand the nature of the charges and to assist in his defense. At both times the doctor found him to have a below average intelligence.
The defendant testified. The following exchanges occurred on direct, cross, and re-direct examination:
"[DEFENSE COUNSEL]: [Defendant], I call your attention to April 14th of last year. At about 10:45 pm, you're charged with entering the *955 utility shed of this policeman who testified with intent to commit a felony or steal something. Do you know anything about this at all?
"A. No, sir. I don't know . . . I was working for the residence of the police, and, uh, I dropped my haircomb, and (indecipherable) Miller opened up just like that. She came out and told me that, `You'se through work,' just like that. And I said, `All right, we're going to have a little fun out here,' just like that. She said, `Yeah, you have a little fun out here. Don't worry about me `cause I am fixing to leave the house right now.' Just like that. We stayed out there and played just like that, and wind up. . . we all went to jail just like that, and, uh, that's all . . that's all . . . that's all that happened. That's all that happened that night that I know of.
"* * *
"Q. Melvin, do you remember being arrested by Sergeant Goscienski?
"A. No sir.
"Q. How did you get to jail?
"A. I . . . the police officers brought us to the jailhouse. I don't know nothing about Sergeant Goscienski though.
"Q. You don't remember police putting handcuffs on you?
"A. No we was, uh, it was a game of fun. And (indecipherable) handcuffs on me. We were all lying handcuffed to each other. (Indecipherable sentence.) And we all got together and all went to the jailhouse together. Just like that. Just for the fun of it. Just like that. We were through working." [Tr. pp. 80-81.]
The State asked him if he was ever convicted of a crime. He said no. The State then asked him about three specific convictions and sentences. The following occurred:
"A. No sir. I deny charges on that. All that evidence is greek . . . all that evidence is complete greek to me. I worked for these people and when I get through work, I be exhausted. So I took a walk up the road, which I was working for Mr. Red Norton, and, uh, in Zachary, Louisiana. (Indecipherable words) I'll take a lie detector test on that. I have never been in no penitentiary. Never been in . . . all. . . (indecipherable) Miller. Always known I was Greg Miller.
I go four (4) years getting my proof that they thought I was Greg Miller. I have . . . I have never been convicted on no charges or nothing without knowledge. I have got no charges on me that I go penitentiary. I don't have no knowledge of it. I had to plead my attorney for knowledge of it. I have got evidence that its pure (indecipherable). . . That I would get convicted on no crime without knowledge. (Indecipherable sentence.) As far as Melvin Weber, my name wasn't Melvin Weber till that time. That's pure. . . I woke up just like this and there was a tag on my bed saying I was Melvin Weber. Just like that.
My name is, uh, Willie Howard. My name is not Melvin Weber. I woke up and found this ticket on my bed. And my name is not . . . Is Greg Miller . . . no, this is Greg Miller right here. Somebody looks just like me. I know somebody looks just like me.
It would be difference if I knew you were talking about somebody else in the Courthouse. But my name is Willie Howard. My name is not Melvin Weber. I've got proof that my name is Willie Howard.
I woke up and found this on my bed saying my name is Melvin Weber, Charlie Ward (indecipherable) in Zachary, Louisiana, where I worked *956 for Mr. Red Norton, not a (indecipherable) with intentions . . . without knowledge.
"THE COURT: Go ahead, [prosecutor].
He denies that . . .
"Q. Your name is Melvin Allen?
"A. My name is Willie Howard.
"Q. Willie Howard?
"A. Yeah, I have proof that my name is Willie Howard. I woke up and found this on my bed. I told Charlie Ward that it was not me. He said, `This is you starting today.' Just like that. And my name is Willie Howard, not Melvin Weber.
That's a difference if you are talking about Melvin Weber. My name is Willie Howard. And he told me he said it to Mr. Norton, and Mr. Norton, and Mr. Norton said to use this name right here. I said, `my name is Willie Howard.' I know my name is Willie Howard. My name is not Melvin Weber.
"Q. Did you tell the doctors this? That your name wasn't Melvin Weber?
"A. I told Mr. Red Norton my name was Willie Howard. He told me, `Use this name right,' and nobody asked questions up to now. On what my name is. My name is not Melvin Weber. Charlie Ward told me `Use this name right here.' I found it on my bed.
My name is Willie Howard. I know my name is Willie Howard. I've got a witness, and he told me, `See Mr. Red Norton . . .'
"Q. Melvin,
"A. . . . `and he said use that name right there.' I said, `Well, tell the judge right now that you told me to use this name.' My name is Willie Howard. I know nothing of Melvin Weber. Just like that. And he said . . .
"THE COURT: Wait, just answer his questions.
"* * *
"BY [DEFENSE COUNSEL]: I have one question. Melvin, is anything wrong with the way you walk?
"A. No sir.
"Q. You walk all right?
"A. Yeah sir." [Tr. pp. 82-86.]
In brief, the defendant argues that the court erred in finding him competent to stand trial since he did not understand what he was charged with, where he was, or who he was, and that his mental disease precluded "the ability to formulate the required specific intent."

SANITY AT THE TIME OF THE OFFENSE
The defendant is presumed sane at the time of the offense. LSA-R.S. 15:432; State v. Rollins, La., 351 So.2d 470 (1977). The defendant has the burden of proving his insanity at the time of the offense by a preponderance of the evidence. LSA-C. Cr.P. Art. 652; State v. Marmillion, La., 339 So.2d 788 (1976).
LSA-R.S. 14:14 sets forth Louisiana's insanity test. It provides:
"If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility."
The thrust of defense's argument is that, although the experts concluded that he was able to distinguish right from wrong, his mental insanity, i. e., his schizophrenic personality and his borderline to mild mental retardation, prevented him from forming specific intent. In effect, counsel contends that defendant had diminished responsibility or capacity to commit the crime by reason of a mental defect or disease, short of insanity, precluding specific intent.
We reject this defense, as we have consistently done previously. A mental defect or disorder short of legal insanity cannot serve to negate the specific intent and reduce the degree of the crime. State v. Jones, La., 359 So.2d 95 (1978); State v. Johanson, La., 332 So.2d 270 (1976); State *957 v. Berry, La., 324 So.2d 822 (1975); State v. Rideau, 249 La. 1111, 193 So.2d 264 (1966). Our Legislature formulated the insanity test in LSA-R.S. 14:14, and any modification or liberalization of the test must come from that body.

PRESENT CAPACITY TO PROCEED
Louisiana Code of Criminal Procedure Article 641 provides:
"Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense."
The defendant carries the burden of establishing by a clear preponderance of the evidence that he lacks the capacity to understand the object, nature, and consequences of the proceedings against him, in a rational as well as factual manner, to consult with counsel in a meaningful way, and to assist rationally in his defense. State v. Bennett, La., 345 So.2d 1129 (1977); State v. Morris, La., 340 So.2d 195 (1976); State v. Veal, La., 326 So.2d 329 (1976). A judge's determination of defendant's present mental capacity is entitled to great weight on appeal. State v. Morris, supra; State v. Flores, La., 315 So.2d 772 (1975). As due process requires that defendant be competent to stand trial, we must examine the record carefully to determine if the judge abused his discretion. State v. Bennett, supra, and the cases cited therein.
Appropriate considerations in determining whether the defendant is fully aware of the nature of the proceedings and is able to assist in his defense include whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he has an awareness of his civil rights; whether he understands the consequences of conviction; whether he is able to recall and relate the facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to testimony of witnesses and inform his attorney as to any distortions or misstatements; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. State v. Bennett, supra; State v. Augustine, 252 La. 983, 215 So.2d 634 (1968).
The record raises a serious question concerning defendant's capacity to stand trial. It appears from the trial court's reasons that the court based its ruling primarily on the experts' conclusions and not on the pertinent factual considerations outlined above. As we stated in State v. Bennett, supra:
"At the inquiry into defendant's competency, these vital factual considerations were supplanted by the physicians' conclusion of law that defendant was able to assist counsel. Only the court, not the doctor, is qualified to make this decision." [Citations omitted.]
We remand the case to the trial court for a re-evaluation of the defendant's capacity at the time of his trial in light of the considerations set forth above. The trial judge should note the following: The discrepancies in the defendant's statements to the physicians concerning his work and school history; the fact that he denied having any mental or medical problems; the fact that Dr. DeVillier reported that defendant "seems uninterested in supplying accurate answers to the questions"; the fact that Dr. Sanders reported that the defendant could assist counsel if "explanations are couched in very concrete, simple terms"; the fact that the defendant was oblivious to the year. We are most concerned with his telling each physician that he was charged with a different crime, neither of which was the crime charged, and the defendant's confusion concerning his name and identity. His ramblings at trial suggest that he did not understand the nature or importance of the proceedings.
It is unnecessary to set aside the jury verdict at this time because we find no *958 other error and the issue as to competence may be clarified on remand. See State v. Bennett, supra; State v. Simmons, La., 328 So.2d 149 (1976). We, therefore, remand for a hearing and reserve to the trial judge the right to set aside the conviction and sentence should he find that the defendant lacked the capacity to stand trial. If, on the other hand, the trial judge determines that the defendant was competent to stand trial, the right to appeal from the ruling is reserved to the defendant. In the absence of such an appeal, the conviction and sentence will be affirmed.
For the reasons assigned, the case is remanded to the district court for further proceedings in accordance with law and the views herein expressed.
SUMMERS and DIXON, JJ., dissent.
SUMMERS, Justice (dissenting).
I agree that the record contains no other error, save the ability of defendant to assist in his defense. However, I cannot agree to the remand. If the State has not made out its case as the majority finds, the conviction should be set aside. To remand gives the State another opportunity to convict the defendant, contrary to the constitutional guarantee against double jeopardy. La. Const, art. I, § 15.