373 So.2d 179 (1979)
STATE of Louisiana
v.
Robert HAMILTON and Philip Franklin.
No. 63823.
Supreme Court of Louisiana.
June 25, 1979.
*180 Loyola Law School Clinic, Kerry P. Cuccia, Supervising Atty., New Orleans, Carolyn Ingraham, James Bonfiglio, Student Practitioners, for defendants-relators.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Harry Hardin, Jefferson Parish Dist. Atty.'s Office, Gretna, Abbott J. Reeves, Asst. Dist. Atty., for plaintiff-respondent.
DIXON, Justice.
Defendants are charged by grand jury indictment with aggravated rape, R.S. 14:42. Defendant Hamilton alone applied to this court for supervisory writs to review the ruling of the trial court finding him competent to stand trial. He urges three assignments of error.
This matter is still in its pretrial stage, but evidence adduced at a preliminary hearing on September 28, 1978 indicates that on the night of August 9, 1978 a fifteen year old girl was seized, raped and robbed by two assailants. A tip from a confidential informant the next day led the police to a person who denied participating in the offense, but who told the officers that Hamilton was one of the two assailants. Hamilton was arrested and, at the stationhouse, he confessed and implicated Franklin.
Defense moved for the appointment of a sanity commission, alleging that defendant's violent and uncontrolled behavior at arraignment indicated that he did not have the mental capacity to understand the proceedings or to assist in his defense. The court appointed Drs. DeVillier and Ritter. Dr. DeVillier testified at the hearing that he found defendant sane and competent to stand trial. Primarily on the basis of a twenty minute interview,[1] he concluded that defendant was mildly to moderately mentally retarded and estimated his IQ in the 40-60 range. Dr. DeVillier testified *181 that defendant knows that "he is being charged with something that is wrong to do... [and] he knows right from wrong on the terms of knowing what is correct... [and] not correct to do in society." However, concerning defendant's appreciation of the consequences he now faced, the doctor only asked defendant if he knew what he was charged with and did not ask him if he knew what rape meant.
Dr. Ritter, on the basis of an hour and fifteen minute interview plus a review of five prior psychiatric examinations and detailed psychological examinations, concluded that defendant was moderately to severely retarded with an IQ of 56 and was unable to understand the nature of the proceedings and the charges against him or to assist his attorney in his defense.[2] Dr. Ritter testified at the hearing:
"This man is moderately to severely retarded. He has an I.Q. of 56 which has been the opinion on five psychiatric examinations and detailed psychological examinations. The man is unquestionably retarded. He received social security disability. I think on that basis as well he is totally illiterate. His fund of knowledge is very small. He is a unreliable historian. His judgment is impaired. It is pretty obvious he has not been able to profer (sic) from any experiences that he has had. His ability to communicate was unquestionably impaired."
Dr. Ritter found defendant's ability to comprehend and communicate extremely impaired.
Dr. Ritter personally performed on defendant a Kent test, a clinical test which consists of ten simple questions. According to the doctor, defendant responded "in a very bad way" because he thought sand was used "to play with" and the wind was coming from the south if the flag flies south. The doctor estimated defendant's mental age was six or seven years old which was what the other documented examinations also found and prognosticated that "at his age, severely mentally, and academically retarded... the test [results are] highly indicative of brain damage. He also had incidentally an abnormal electroencephalogram indicative of brain damage."
Also, the doctor testified that defendant knew the word "rape" but "he doesn't have an understanding of what rape actually is and I went into at least a twenty-five minute detail inquiring about this. ... He was unable to make the connection between rape and sexual intercourse." Although defendant knew what normal sexual relations were, he had such a "tremendous diminished capacity in understanding the difference from right and wrong" that he could not, in effect, distinguish between seductive and forcible intercourse. In response to the state's question, "You limited your examination specifically to the crime of aggravated rape and came to the conclusion that he did not know right from wrong of the crime of having sexual intercourse," the doctor replied, "That is exactly my conclusion."
After Dr. Ritter testified, the trial court ruled:
"... the Court is not bound with one particular expert. The Court determines the weight or feeling whatever is necessary under the circumstances. I don't want this decision to be weighed *182 that either of the doctors are competing with another. It just seems to me that I listened to the questioning and the Court is of the opinion that Mr. Hamilton is able to proceed with the trial. He does know that an alibi is required and I have a great faith in the trial system and I think he can stand trial."
In brief the defense argues that the trial court failed to consider various factors set forth by this court as an aid to the determination of defendant's capacity to proceed. Finding merit in this assignment of error, we pretermit consideration of the others.
C.Cr.P. 641 provides:
"Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense."
This court has repeatedly stated that the defendant carries the burden of establishing that he lacks the capacity to understand the object, nature and consequences of the proceedings against him, and that he is unable, in a rational as well as factual manner, to consult with counsel in a meaningful way, and to assist in his defense. State v. Weber, 364 So.2d 952 (La. 1978). A judge's determination of defendant's present mental capacity is entitled to great weight on appeal, but, as due process requires that a defendant be competent to stand trial, we must examine the record to determine if the judge abused his discretion. State v. Weber, supra; State v. Bennett, 345 So.2d 1129 (La.1977).
We outlined the appropriate considerations that the trial judge should apply in determining the defendant's capacity to proceed in State v. Bennett, where we stated:
"The decision as to a defendant's competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case and the gravity of the decisions with which he is faced... Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. ..." 345 So.2d at 1138.
In the instant case, the record raises serious questions concerning defendant's capacity to stand trial. The record reveals that the hearing was mainly devoted to an inquiry into defendant's ability to distinguish right from wrong. As this court noted in State v. Bennett, supra, a defendant's capacity "to know the difference between right and wrong would have been relevant in determining his criminal liability, but was totally irrelevant to the issue of his competency to stand trial." 345 So.2d at 1137.
In the instant case the record establishes that defendant did not understand that forcible sexual intercourse was wrong; he did not understand seduction, nor the difference between seduction and forcible sexual intercourse, neither the words nor the concepts. Perhaps defendant knows the *183 word "rape," and he might know that rape is wrong, but the record does not indicate that he understands what rape is, or that impulsive satisfaction of sexual desire by force is wrong. Nor does the record indicate that defendant understands the pleas of not guilty and not guilty by reason of insanity, and the consequences that might flow from either plea.
Dr. Ritter indicated that the accused might have an alibi defense and the trial court placed great weight on that fact in its ruling. However, the defendant knew that he was in jail, accused of doing wrong. Even a child's defensive mechanism will be triggered in the face of an accusation, whether or not he can reasonably defend against it. Further, the doctor described defendant as a "bad historian;" this observation is significant for a defendant who will be required for trial to reconstruct a past time in his life accurately and specifically, and to aid his defense counsel in finding witnesses who might support that account.
Finally, the record fails to disclose that defendant is capable of actively assisting counsel in his defense. The victim misidentified two men as her assailants;[3] therefore, her testimony will be open for cross-examination and defendant's confession will be critical in the case. To aid his defense, defendant must understand the importance of the suppression hearing, the consequences of its determination of the admissibility of his confession, and the necessity of assisting his attorney in the critical cross-examination of police witnesses.
Further, defendant must be capable of taking the stand if trial strategy requires it, but the record does not show whether defendant could testify in his own behalf, or even communicate with his counsel. Only Dr. DeVillier found defendant mildly retarded; Dr. Ritter and the previous examining psychiatrists all found defendant moderately to severely retarded. Dr. Ritter found defendant's ability to comprehend and communicate extremely impaired. If defendant is as severely retarded, possibly brain damaged, with serious speech problems as some of the record indicates, then there is a serious question whether he can put forth a coherent direct examination and withstand a strong cross-examination at trial.
The trial court repeatedly stated that it was concerned that a determination of incompetency might result in defendant's indefinite incarceration in a mental institution. Although this court has often cautioned that mental retardation does not alone compel a finding of incompetency, we have also recognized that due process requires a level of effective participation by an accused in criminal proceedings against him, and that an indigent defendant who is forced to rely on findings of a court appointed sanity commission has a right to a thorough examination. State v. Bennett, supra, at 1137-1138. Due process requires a trial court to consider and weigh carefully the considerations set out in State v. Bennett, supra, and State v. Weber, supra, which was not done in this case.
Only when the record does not suggest further inquiry into the defendant's sanity do the burdens of proof and standards of judicial review, normally relied on to uphold a judge's finding that the defendant is competent, come into play. State in the Interest of Causey, 363 So.2d 472 (La. 1978). In the present case the conclusions of the two doctors differ. One is unsupported by reasons and factual information, and is supported only by a twenty minute interview and the doctor's experience. The conclusions of the other doctor are amply supported by information and reason, and forcefully suggest that defendant cannot understand the proceedings and assist counsel.
Therefore, the ruling of the trial court is reversed, and the case is remanded for further proceedings to determine *184 whether defendant lacks the capacity to understand the proceedings against him or to assist in his defense.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
In determining whether the accused has the mental capacity to proceed in the instant case, the majority requires the accused to exhibit such levels of understanding that, henceforth, it will be most difficult to proceed against those who are of a low mentality. While the conclusions of the two doctors herein differ on defendant's mental capacity to proceed, I am unable to say that the trial judge abused his discretion, particularly since defendant has the burden of establishing that he lacks the capacity to proceed. Accordingly, I respectfully dissent.
NOTES
[1] Dr. DeVillier testified that he had browsed through past information concerning defendant, but that he did not examine very closely the psychiatric and psychological test results, because he liked to see the patient before studying his background.
[2] Dr. Ritter further explained his other findings concerning defendant as follows:

"A. It is very difficult [to learn] with an I.Q. of 56. Your judgment, the impairment and absorption is what makes mental retardation. Mental retardation, the impairment to profer (sic) from experience, the impairment in learning and that implies not only the A, B, C's but in learning the rules under which we all live and this again is reflected on previous psychiatric and psychological examinations dating back to the time when he was ten. It was not only at that point that it was recognized that he was retarded but he was a disturbing factor in school. His behavior at that level was antisocial in the school system and he was repeatedly tested and they tried to place him in special classes and even in the special classes apparently he was unable to learn sufficient to be retained in those classes as a result of those impairments. It is not difficult to conclude that he not only didn't learn his A, B, C's, his reading and writing and also he didn't learn the moral values and the mores in society and the law."
[3] The victim tentatively identified a man from a photographic display; after the informant's tip led the officers to another man, the victim tentatively identified this second man's photograph. This second man told officers that defendant, Hamilton, was one of the assailants.