393 So.2d 1224 (1981)
STATE of Louisiana
v.
Raymond ROCHON.
No. 80-KA-1723.
Supreme Court of Louisiana.
January 26, 1981.
Rehearing Denied March 2, 1981.[*]
*1225 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., L. Paul Gianfala, Asst. Dist. Atty., for plaintiff-appellee.
Bertrand DeBlanc, Lafayette, for defendant-appellant.
LABORDE, Justice Ad Hoc.[**]
Defendant Raymond Rochon was indicted by an Acadia Parish Grand Jury in connection with the April 30, 1978 aggravated rape of one Gloria Ann Francis, a violation of La.R.S. 14:42. Following trial before a twelve member jury, defendant was convicted and sentenced to life imprisonment at hard labor. The present appeal urges five arguments as grounds for reversal of the accused's conviction and sentence.
STATEMENT OF FACTS
During the late evening of April 29th, 1978, defendant picked up Carol Washington and Gloria Ann Francis under the pretext of giving them a ride to a nearby sandwich shop in Rayne, Louisiana. Instead, defendant drove to a dark gravel road outside of Rayne, stopped the car, produced a rifle and, after firing several shots near the victims, forced each of them to have sexual intercourse with him. After this incident, defendant then drove the pair back to Rayne, where they exited the vehicle and ran to a nearby house.
Defendant was apprehended shortly thereafter and pleaded not guilty to charges of aggravated rape at his arraignment on May 11, 1978. However, subsequent prosecution of the accused was delayed when a court-appointed sanity commission twice concluded that defendant was incapable of understanding the nature of the proceedings against him and that he was unable to assist in the preparation of his defense. Following lengthy treatment in the Forensic Division of the East Louisiana State Hospital, the accused's psychotic illness was brought under control through use of medication and he was adjudged competent to stand trial. At the conclusion of this latest competency hearing on March 27, 1979, defendant withdrew his previous plea of not guilty and tendered to the court a plea of not guilty and not guilty by reason of insanity.
*1226 As the accused's trial began on December 6, 1979, the selection of prospective jurors was repeatedly interrupted by the defendant's disruptive behavior. Immediately prior to the start of voir dire examination, the courtroom was cleared and the trial court cautioned defendant to remain quietly seated during the course of trial. Defendant ignored the court's warning, interrupting voir dire examination just moments later with the following protestation:
MR. ROCHON: I don't want this attorney... because they're not going to represent me very well, and I can't be proved innocent on very well. They're not even familiar with my case, and they're not going to represent me, so you do what you want.
For this outburst, defendant was held in contempt, and, outside of the jury's presence, again instructed to behave. However, defendant responded only by raising his shirt and scratching his navel.
The state and the defense then completed voir dire examination of the first group of prospective jurors, ten of whom were selected to serve. No sooner were these jurors sworn than defendant resumed his disruptive antics, this time by removing all of his clothes in open court. Jurors and prospective jurors were quickly hustled out of the courtroom and defendant was again held in contempt. To prevent a repetition of this behavior, the trial court ordered that defendant be placed in an adjacent room where a full mechanical sound system was installed which would enable the defendant to hear all of the proceedings taking place in the courtroom. Accompanied by John Craton, one of his court-appointed attorneys, defendant was then led into the adjacent room, where he was handcuffed and shackled. A deputy sheriff was also on hand to guard the accused.
Before voir dire examination was resumed, Judge Fontenot questioned those jurors who had already been seated as to whether they could set aside defendant's behavior and decide the case solely on the basis of evidence adduced at trial. Each juror responded affirmatively. Jury selection was then completed and court was adjourned for the day.
Court was reconvened on the following day. On the request of counsel for the defendant, the Clerk announced that defendant had been rearraigned following his most recent competency hearing, at which time he had entered a plea of not guilty and not guilty by reason of insanity. Though both counsel for the state and for the defendant claimed surprise at this plea, neither side requested either a mistrial or a recess. The defense did request that voir dire examination be reopened to permit questions as to the jurors' understanding of the defense burden of proof in an insanity case and their ability properly to apply a preponderance of evidence standard in face of an insanity defense.
Following the denial of this motion, defense counsel moved for a mistrial, claiming that the accused was again unable to assist in his defense and that he did not understand the nature of the proceedings against him. In response, the state requested that members of the previously-appointed sanity commission re-examine the defendant and report their findings to the court. When the defense indicated its agreement with this procedure, Dr. Wyatt, a psychiatrist of fifteen years experience, and Dr. Robert McManus, the Acadia Parish Coroner, were summoned to the courthouse.
After completing his examination of defendant, Dr. Wyatt was called to testify in support of defendant's motion for mistrial. Dr. Wyatt stated that he had previously examined the defendant on December 11, 1978 and had found at that time that the defendant was unable to assist in his defense in this case. Subsequently, he reexamined the defendant on March 27, 1979, whereupon Dr. Wyatt concluded:
"Since my last examination, December 1978, the patient had had in-patient treatment at the psychiatric hospital. There is no overt evidence of psychosis at this particular time. He is maintained on chemotherapy, which helps to control the symptoms. He is more organized in his thinking, but still has some limitations in *1227 his ability to recall things during the time when he was more acutely disturbed. However, I feel he is improved enough to assist in his defense."
Dr. Wyatt saw defendant on three or four more occasions between March 27, 1979 and September, 1979. On each occasion, he felt that defendant "had appropriate concern" about his upcoming trial.
In connection with Judge Fontenot's request that he determine the accused's present capacity to proceed with trial, Dr. Wyatt twice examined the defendanton December 6, 1979, the first day of trial, for about twenty minutes, and again on December 7, 1979 for about forty-five minutes. As regards these examinations, Dr. Wyatt testified as follows:
Q. Would you give us the approximate time and location and circumstances under which you spoke to Mr. Rochon yesterday?
A. I spoke to him at the Judge's request here in the outer Chamber, and as I understood it, the purpose of the request of the Judge was to see if I could calm Mr. Rochon down, and I did go in and tried to engage him in a conversation, and it was obvious that he was quite agitated, extremely distressed, quite angry, rejecting. He would not really look directly at me, nor would he respond verbally to any direct questions. I quite often had the feeling that he was preoccupied and did not hear some of the things I addressed to him, but, of course, again, that's speculation, because I have no way of proving that. I had no way of conducting, in any manner, an organized mental status examination because of his inaccessibility, or his refusal.
Q. You did in fact were able to talk to him about certain matters, is that correct?
A. I asked questions. I got very little in response.
Q. Now, you stated that you did not have an opportunity to conduct an indepth analysis of Mr. Rochon yesterday. Since that time have you visited, and we are now twelve thirty-five (12:35) of December 7th? Have you had an occasion since then to, since yesterday, to conduct a more detailed analysis of Mr. Rochon?
A. I spent more time with him today; would say a total of about forty-five (45) minutes today whereas yesterday was much briefer, fifteen (15), maybe twenty (20).
Q. As a result of you spending the forty-five (45) minutes in Chambers with Mr. Rochon, were you able to come to any conclusions regarding his present ability to assist in his defense at this time, considering that the trial is now in progress and we have to assist at the present time?
A. It is my opinion that he is not capable of assisting in his defense.
Q. Doctor, are these self-induced just because he doesn't want to, or are there any psychotic or mental illnesses that this is a result of?
A. As I said earlier, my best opinion now would be that he is experiencing an exascerbation of some psychotic illness, and that this is interfering with his ability to relate in a fashion that would be helpful.
After direct examination by defendant's counsel and cross by the state, the trial court conducted its own examination of Dr. Wyatt. In response to the court's questions, Dr. Wyatt stated that he believed the defendant to be of low average intelligence. Dr. Wyatt also conceded that defendant's behavior might be intentionally calculated to obstruct further proceedings:
THE COURT. If I were to tell you that Mr. Rochon, or it seems that Mr. Rochon was very articulate at the beginning of the trial, where he articulated all of his rights or many of them as contained in the United States Constitution, would that shed some light on the subject?
A. Certainly, it would be meaningful.
THE COURT. It would be meaningful to the extent that we could somewhat assume that Mr. Rochon knew where he was, knew that he was in a Courtroom and not only that, that he was bright enough to know that he had the right to remain in this Courtroom to hear all of the testimony.

*1228 A. I agree.
THE COURT. And if that he stated that and made that announcement to the Court, wouldn't that indicate that this later subsequent pattern of behavior which was totally disruptive was calculated?
A. With that sequence and background, it would give more credence to that, that's true.
THE COURT. If he was totally frustrated and became hostile, when he saw, for example, that he was going to have to go to trial.
A. That's true. I would agree.
THE COURT. Even if we assume that Mr. Rochon suffers from paranoia-schizophrenia psychotic disorder, are paranoidschizophrenics always completely out of touch with reality?
A. No. No, they're not. This is athere can be, you know, a remission of symptoms, even spontaneous at times. This can happen without treatment. The majority of them though the remission takes place under treatment, and the chemotherapy, as we've discussed, is the primary mode of treatment because it is the thought or mind altering drug.
However, even considering the behavioral patterns described by the Court, Dr. Wyatt again stated that, in his opinion, defendant was incapable of assisting in his defense.
The remaining member of the Sanity Commission, Dr. Robert McManus, was also called to testify in support of defendant's mistrial motion. On direct examination, Dr. McManus testified that he had examined the defendant on numerous occasions in the past and that he had treated him in the Parish Jail for other medical problems. He testified that he too had examined the defendant on December 12, 1978 and, at that time, felt him to be in need of psychiatric care. Subsequently, in March, 1979, he reexamined the defendant and concluded that his improvement was such as to enable him to stand trial at that time. As a result of his later examination on December 7, 1979, Dr. McManus felt that defendant would not cooperate with his attorneys, but he explained that his behavior was largely "play acting" on the part of defendant. Dr. McManus further stated that he believed that defendant had the mental capacity and ability to put over such "play acting."
On the basis of this testimony, as well as her own observations of the accused's behavior, Judge Fontenot ruled that the defendant was fully competent to stand trial. In so ruling, the court necessarily denied defendant's motion for mistrial. It is this denial which forms the heart of defendant's first argument on appeal.

ASSIGNMENT OF ERROR NO. 1
By this assignment, defendant contends that the trial court erred in finding that the accused had sufficient mental capacity to proceed with trial when defendant's behavior and expert psychiatric testimony indicated otherwise.
According to La.C.Cr.P. Art. 641, mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant lacks the capacity to understand the proceedings against him or to assist in his defense. Jurisprudence interpreting this article has held that the defendant carries the burden of establishing that he lacks the capacity to understand the object, nature and consequences of the proceedings against him, and that he is unable, in a rational as well as a factual manner, to consult with counsel in a meaningful way. State v. Weber, 364 So.2d 952 (La.1978); State v. Hamilton, 373 So.2d 179 (La.1979). The trial court's determination of defendant's mental capacity is entitled to great weight on appeal, but, as due process requires that a defendant be competent to stand trial, Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975), this Court must examine the record to determine if the judge abused her discretion. State v. Bennett, 345 So.2d 1129 (La.1977); State v. Weber, supra.
In State v. Bennett, supra, at 1138, this Court outlined the appropriate factors that the trial judge should consider in assessing the defendant's capacity to proceed:

*1229 "The decision as to a defendant's competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case and the gravity of the decisions with which he is faced.... Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to wellexplained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial...."
In the instant case, the defense failed to inquire as to the accused's comprehension of the word "rape" or his understanding of an insanity plea. However, at the March 27th sanity hearing, both Dr. Wyatt and Dr. McManus stated that defendant could appreciate the seriousness of a rape charge as well as the consequences of conviction.[1] At that time, defendant understood the nature of a rape charge and entered a plea of not guilty and not guilty by reason of insanity.
In large part, the inquiry into defendant's competence was thwarted by his failure to respond to questions. For this reason, much of the doctors' examination centered upon the accused's ability to understand the questions which were put to him. In this regard, Dr. Wyatt felt that defendant's failure to respond was due to his preoccupation with other matters. Dr. McManus disagreed, noting that defendant had shown a greater willingness to respond to questions from Dr. Wyatt than from himself. In view of his past experiences with defendant, Dr. McManus believed that defendant was wilfully refusing to cooperate. While Dr. McManus conceded that this attitude might hamper defense efforts, he emphasized that this result was not caused by any inability on defendant's part:
THE COURT. So, it would be uncommon, if something made him unhappy, like having to go to trial, if he would experience what we experienced in this Courtroom yesterday, namely, loud talking, screaming and yelling and taking his pants off.
A. This has beenI think if you look back over his history and could get some of the people out at the jail, you'd find this has been his pattern for years. We've had him here for ten (10) years, off and on. We've had problems with him for ten (10) years.
THE COURT. If something doesn't go his way he(interrupted)
A. He has a tendency to pout and not answer questions.
THE COURT. That doesn't mean that he didn't understand the questions I was asking him though, does it?
A. No, ma'am.
THE COURT. In other words, it's your candid, or our preferred opinion, that he knows where he is, he understands what's going on here, and he just absolutely refuses to assist(Interrupted)

*1230 A. Yes, I lean towards the fact that I think a lot of this is showmanship on his part, notwithstanding the fact that he probably does, and we certainly have to agree that he has some psychosis, but I think he's very manipulative. I think he's manipulated people in the past. It's my opinion he's manipulating us today. There's only one other question I'd like to say. I asked him in there, specifically asked him, if what he wanted was for us to take the stand and say the he was unable to proceed, so that the Judge would then either declare a mistrial, or recess things to where he would have to be sent back to the hospital, and then, be brought back again for retrial, even though most of the time he wouldn't even look at me after I asked him, all he did this time was raise his head and a little faint smile. So, I think I got through to him, and this was one of the things that made me think perhaps that he washe heard what we were saying.
THE COURT. He understood you?
A. Yes.
Indeed, defendant appeared quite articulate when, at the start of voir dire examination, he clearly expressed his intent to obstruct further proceedings:
MR. ROCHON: I'll sit quietly, but when I feel that I'm misrepresented, and when I feel that my rights have been violated, I'll speak up for my rights, and if that's wrong, take me where you want to take me.
THE COURT: All right, Mr. Rochon. I'm suggesting to you out of the presence of anyone who may serve on this jury that I will not tolerate any conduct from you which is the least bit disruptive. Do you understand that?...
MR. ROCHON: If you're telling me to sit down and shut up when it's right or wrong, I can't do that. Because if it's right, I'm going to shut up. If it's wrong, I'm gonna speak, because I feel that I have freedom of speech.
THE COURT: Fine. You speak up to your lawyer, if you feel that anything is transpiring that is not correct.
MR. ROCHON: If he don't want to speak to what I'm saying, I'll speak for myself.... Your Honor, maybe I'm speaking out of turn, but I feel that I'm notseems as though this a free trial, or whatever. I'm speaking in front of a Judge and in front of my attorney, and I feel and believe that all of my witnesses and people that are concerned of thisof what I'm accused of should be available to hear what is going on. I mean, why should it be a private court. I mean, I'm no special person; I'm an ordinary person, I mean why shouldn't everybody be ran out, and why shouldn't everybody hear what's going on. If I misconduct myself, well, I feel and believe that they should know that I misconduct myself; I fail to believe that I have misconducted myself.
(Emphasis supplied.)
On the basis of this evidence, it is difficult to say that the trial court abused its discretion in concluding that defendant's aberrant behavior and apparent unresponsiveness formed a deliberate scheme on his part to prevent further proceedings against him. Though the trial court was unable to delve into all the factors enumerated by Bennett, this inability was clearly attributable to the accused, who seemed quite capable of assisting in his own defense.[2] Under these circumstances, the trial court's refusal to order a mistrial on grounds of defendant's incapacity was not erroneous.
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. 2
By this assignment, defendant claims that the trial court erred in denying his request to reopen voir dire examination when counsel for both the state and the defense had conducted such examination *1231 under the erroneous belief that the accused had entered a plea of not guilty rather than a plea of not guilty and not guilty by reason of insanity. Defendant argues that the trial court's refusal to permit further inquiry into the jurors' understanding of the defense burden in an insanity case effectively undermined his right to conduct a full voir dire examination. La.Const. 1974, Art. 1, § 17; Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); State v. Dixon, 365 So.2d 1310 (La.1978).
This Court accepted a similar defense argument in the recent case of State v. Hawkins, 376 So.2d 943 (La. 1979). In that case, the accused urged insanity in defense to charges of attempted murder. Despite this line of defense, the trial court refused to permit defense counsel to inquire into a prospective juror's understanding of the term "preponderance of the evidence" as distinguished from "proof beyond a reasonable doubt." Holding that such a restriction of voir dire was erroneous, this court stated:
"A defendant who pleads insanity as a defense is certainly entitled to have jurors who understand the burden of proof required to prove his plea of insanity at the time of the commission of the offense. Even those of us purportedly well-versed and trained in legal terminology are not without difficulty in understanding "preponderance of evidence" vis a vis "beyond a reasonable doubt" as a degree of proof. On the assumption that jurors might not understand these critical legal principles so vital to his defense, it follows that the trial judge erred when he cut off all examination by the defense on this issue.
We have previously rejected the contention that restrictions on voir dire examination concerning the presumption of innocence were cured by a general instruction that the jurors must follow the law as given to them by the court. State v. Monroe, 329 So.2d 193 (La.1975). Therefore, the judge's explanation of the law to the jurors and their answer under oath to accept and apply it satisfies only a part of the inquiry. The other part is whether or not the juror really understood the legal principle involved. Counsel should have had the opportunity to assure himself that the juror did understand the vital legal principal at issue here."
376 So.2d at 950.
Unlike Hawkins, the defense in the case at bar failed to introduce any evidence to establish the accused's insanity at the time of the offense and, despite defendant's plea, made no effort to urge this defense in closing argument. The accused's disruptive trial court behavior properly had a bearing only on the issue of capacity to proceed and therefore, did little to suggest the defendant's insanity at the time of the offense. Under these circumstances, the refusal to reopen voir dire examination in no way prejudiced the defense. La.C.Cr.P. Art. 921.[3]
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. 5
By this assignment defendant argues that the trial court erred in permitting Detective Kenneth Goss to read into evidence a statement taken from the victim, Gloria Ann Francis, on grounds that said statement contained references to the rape of Carol Washington.
This contention is totally without merit. As noted previously, the defendant abducted both women under the pretext of providing transportation to a nearby sandwich shop. He then drove to a dark gravel road outside of Rayne, where he forced each woman to engage in sexual relations with him. In this factual scenario, the aggravated rape of Gloria Ann Francis which forms the basis of the present charge and the subsequent rape of Carol Washington formed one continuous transaction. As such, evidence of the rape of Ms. Washington *1232 was properly admitted as part of the res gestae of the charged offense. La.R.S. 15:447, 15:448; State v. Joseph, 341 So.2d 861 (La.1977); State v. Tornabene, 337 So.2d 214 (La.1976).
In any event, this "other crimes" objection is raised for the first time in brief to this Court. Since no contemporaneous objection was raised by the defense at trial, the error alleged herein has not been properly preserved for review by this Court. La.C.Cr.P. Art. 841; State v. O'Blanc, 346 So.2d 686 (La.1977); State v. Davis, 357 So.2d 1125 (La.1978).[4]
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. 7
This assignment concerns the denial of defendant's oral motion to discharge his trial counsel, Kenneth Privat.[5]
Following selection of the initial panel of prospective jurors, defendant's objections to Mr. Privat's continued representation in this matter were noted for the record. Though defendant failed to avail himself of the opportunity to explain the precise basis of this objection, it is apparent from defense counsel's record statement that the accused had expressed a belief that Mr. Privat was not acting in his best interest. Construing these remarks as a motion to dismiss counsel, the trial court denied defendant's request.
As trial proceeded, it became apparent that defendant and counsel were in serious disagreement as to the defense theory of the case. Not only did Mr. Privat claim to be unaware of his client's previous insanity plea, but he also completely disregarded this line of defense in presenting the accused's case to the jury. Viewed in this context, the defendant's earlier protestations that Mr. Privat knew nothing about his case took on a somewhat prophetic character.
Nevertheless, it is generally held that a trial court does not abuse its discretion in refusing, on the morning of trial, to grant the accused's motion to discharge his courtappointed counsel. State v. Wiggins, 337 So.2d 1172 (La.1976); State v. Anthony, 347 So.2d 483 (La.1977). Under these decisions, the delay in raising this contention until the day of trial is viewed as signaling an intent to interfere with the fair administration of justice.
In the case at bar, several factors suggest the use of the motion to dismiss counsel as a dilatory tactic. Defendant had selected Mr. Privat from a list of available attorneys to serve as his court-appointed counsel following his dismissal of two previously appointed attorneys, Jerry Harmon and T. Barret Harrington. Since the time of Mr. Privat's appointment, the accused had appeared before the trial court on numerous occasions without any complaint made as to counsel's representation. Defendant's repeated disruptions of trial are also seriously suggestive of an intent to forestall further proceedings. In view of these factors, it is difficult to argue that the trial court abused its discretion in denying defendant's motion to dismiss Mr. Privat as his trial counsel.
This assignment lacks merit.
ASSIGNMENTS OF ERROR NOS. 8, 9 and 10.
By these assignments, defendant contends that the trial court's decision to remove him from the courtroom effectively deprived him of the right to be present during trial and to confront the witnesses against him. La.Const. 1974, Art. 1, § 16; La.C.Cr.P. Art. 831.
*1233 This contention is totally without merit. In Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the United States Supreme Court held that "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." 90 S.Ct. at 1060. The Court went on to state three permissible ways of dealing with an obstreperous defendant: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.
In the case at bar, the accused was repeatedly warned to remain quietly seated during the course of voir dire examination and trial. In face of these warnings and a contempt citation, defendant clearly indicated an intent to continue his disruptive behavior. When the accused made good on this promise by disrobing in front of the jury, the trial court had little choice but to remove the defendant from the courtroom. However, in the present case, even this banishment was effected with the greatest possible respect for defendant's rights. A sound system was set up in the anteroom where defendant was held so as to enable him to hear the proceedings against him. Furthermore, co-counsel John Craton sat with defendant during the entire trial, thereby providing a means by which defendant could communicate with his trial counsel, Kenneth Privat. Through use of these safeguards, the trial judge was able to maintain courtroom decorum with little infringement on the accused's rights. Under these circumstances, the trial court did not commit reversible error in ordering defendant removed from the courtroom. State v. Burnette, 337 So.2d 1096 (La.1976) and State v. Passman, 345 So.2d 874 (La. 1977).
This assignment lacks merit.
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[*] Blanche, J., did not participate in rehearing.
[**] Judges Guidry, Foret and Laborde of the Court of Appeal, Third Circuit, participated in this decision as associate justices ad hoc, joined by Chief Justice Dixon and Associate Justices Marcus, Blanche, and Lemmon.
[1] In Acadia Parish, the findings of a court-appointed sanity commission are reported by means of a form which parrots the factors enumerated in Bennett. By so structuring the competency inquiry, the trial court is deprived of any factual basis on which to base a finding of capacity to stand trial.
[2] Following trial, the State was permitted to adduce evidence which showed that defendant had in fact conversed with his attorney on several occasions while seated in the court's anteroom during trial.
[3] In any event, the time for challenging jurors has passed where said jurors have already been seated and sworn. La.C.Cr.P. Art. 795; State v. Schmitt, 354 So.2d 1339 (La.1978). At this point, the defendant's only available remedy was mistrial.
[4] This objection arose when defense counsel attempted to impeach Ms. Francis' credibility by calling Detective Goss to the stand to testify as to facts surrounding the taking of Ms. Francis' original statement. At trial, Ms. Francis admitted giving a statement to Detective Goss, but claimed that the written statement in Goss's possession did not accurately reflect her original story. At the insistence of the district attorney, Ms. Francis' prior statement was read to the jury in its entirety. It was this procedure which was objected to by the defense. Tr., Vol. II, pp. 221-225. No "other crimes" objection was ever lodged. In fact, allusions to the rape of Ms. Washington had been made throughout trial.
[5] This contention is urged at defendant's request.