426 So.2d 118 (1983)
STATE of Louisiana
v.
Johnny NARCISSE.
No. 81-KA-2285.
Supreme Court of Louisiana.
January 10, 1983.
Concurring Opinion January 25, 1983.
Rehearings Denied March 25, 1983.
*122 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., Michael Harson, Charles Brandt and Max Jordan, Asst. Dist. Attys., for the State.
David Clarke, Lafayette, for defendant-appellant.
DIXON, Chief Justice.
Defendant Johnny Narcisse was arrested on March 18, 1979 for the March 17, 1979 murder of Elby Jolivette. He was subsequently indicted by the Lafayette Parish grand jury for first degree murder, in violation of R.S. 14:30. Two years later, on May 26 through May 29, 1981, defendant was tried and a unanimous jury returned a verdict of guilty as charged. After the sentencing phase of the bifurcated trial, the jury unanimously recommended the death penalty on a finding of two aggravating circumstances: that the offender was engaged in the perpetration or attempted perpetration of an armed robbery; and that the offense was committed in an especially heinous, atrocious or cruel manner (C.Cr.P. 905.4). The trial judge thereafter sentenced defendant to death. On appeal, defendant presents five arguments for the reversal of his conviction and sentence.
The facts involved are essentially as follows: on March 17, 1979 at approximately 6:00 p.m. Johnny Alexander discovered the body of his seventy-four year old aunt, Elby Jolivette, lying by her bathroom door. Alexander lived near his aunt and had last seen her in her backyard about 8:30 that morning. At that time Alexander had noticed a small white car parked in front of his aunt's house. When he returned from work that evening, his wife mentioned that she had not seen Mrs. Jolivette during the day. After getting no response at his aunt's house, Alexander telephoned neighbors and relatives in an attempt to locate her. When he learned that no one had heard from her that day, he walked over to her house and crawled in through the window. Mrs. Jolivette's body was sprawled on the bedroom floor. Alexander then notified police.
Alfreda Onezine testified that on March 17, 1979 she visited her mother whose house faced the Jolivette house. When she arrived at her mother's house between 8:30 and 9:00 a.m., she noticed a small white car parked in front of the victim's house. The witness identified the car as belonging to the defendant Johnny Narcisse. At the time of the crime, Ms. Onezine and the defendant's wife worked together. Daily the witness observed defendant drive his wife to work in that car. Ms. Onezine did not know when the car was moved from that spot nor did she see defendant drive the car away.
After the detectives investigating the homicide learned that defendant's vehicle had been spotted at the Jolivette residence, they picked him up at his home. The defendant accompanied the detectives to the police station, where he was advised of his rights at 2:20 a.m. on March 18, 1979. When a warrantless search of both his residence and a garbage can near his garage yielded blood stained clothing and other items which connected defendant to the crime, defendant was formally arrested at 4:55 a.m. At 6:00 p.m. on the same day, defendant confessed to the murder of his great-aunt Mrs. Jolivette. The state bolstered that account at trial by introducing defendant's knife smeared with blood of the same type as the victim's and by presenting expert testimony to the effect that defendant's shoes apparently matched a bloody print found on a rug near the victim's body.

*123 Argument No. 1 (Assignment of Error No. 4)

By this assignment defendant contends that the trial court erred in allowing his wife to divulge the contents of a confidential conversation with defendant.
The state called defendant's ex-wife, Veronica Narcisse, as a witness. The prosecutor questioned her about her relationship with the defendant and about their activities on March 16 and 17, 1979. The witness clarified that although she had been married to defendant at the time of the homicide, they were now divorced. After the prosecutor asked the witness whether defendant had made any statements to her relative to his great-aunt's death, defense counsel objected, asserting the marital privilege. The judge sustained the objection. However, further examination revealed that the statements complained of were made in the presence of a third party, defendant's mother. The witness recalled that defendant spoke in a normal tone of voice and made no indication that his mother was not to hear his statements. The judge then overruled the objection, "satisfied that this was not a private conversation." The witness proceeded to testify that at 10:00 p.m. on March 17, 1979: "He said that she had been stabbed. She was stabbed. He told me a certain amount of times, but I don't remember exactly, but he said she was stabbed. Just like that."
R.S. 15:461 provides in pertinent part that:
"The competent witness in any criminal proceeding, in court or before a person having authority to receive evidence, shall be a person of proper understanding, but:
(1) Private conversations between husband and wife shall be privileged."
Where there is a lack of evidence to the contrary, communications between spouses are presumed to be confidential. State v. Dupuy, 319 So.2d 294 (La.1975); State v. Pizzolotto, 209 La. 644, 25 So.2d 292 (1946).
In State v. Dupuy, supra, this court addressed a similar situation. In that case the defendant had challenged a trial court ruling allowing his wife to testify with respect to communications he contended were confidential. The wife testified that third persons were present at the time of the conversation. This court held that the trial court did not err in ruling that spousal immunity was unavailable to the defendant.
In the case before us, Veronica Narcisse was questioned both in and out of the presence of the jury as to statements made by the defendant. She testified that a third person was present at the time of the conversation and that defendant neither whispered nor gestured to indicate that their conversation was private. The state thus made a prima facie showing that the communications were not privileged which was not rebutted by the defendant. The trial court did not err in concluding that the statements were not privileged within the purview of R.S. 15:461.
This assignment of error lacks merit.

Argument No. 2 (Assignments of Error Nos. 6, 7 and 11)
By these assignments defendant contends that the trial court erred in admitting his confession into evidence.
At trial, and out of the presence of the jury, the state laid the predicate for the introduction of defendant's confession. The state called Detective Dale Broussard as the sole witness to establish the voluntariness of the confession. Detective Broussard of the Lafayette Police Department testified that he took a statement from defendant between 5:30 and 6:00 p.m. on March 18, 1979. Although Detective James Credeur was present in the room during the initial questioning of the defendant, Broussard acknowledged that he was alone with the defendant when he actually typed the inculpatory statements. Defendant was observed to be very calm and alert while giving the confession. Broussard advised defendant of his Miranda rights after which the defendant signed a "waiver of rights" form. Defendant was informed of his Miranda rights a second time when he received the "voluntary statement" form. Defendant initialed that he understood the *124 rights printed on top of the prepared form. Broussard typed the statement that defendant gave both voluntarily and in response to questions. After the confession was completed, Broussard read over it again with defendant who initialed typographical errors and then signed the statement.
On cross-examination defense counsel questioned Broussard concerning defendant's whereabouts from the time he arrived at the police station nearly sixteen hours before he gave his statement. Broussard recalled that defendant arrived at the station at approximately 2:20 a.m., that he was informed of his Miranda rights at 2:23 a.m. and that defendant was actually arrested at 4:55 a.m. That morning defendant told Broussard that "he didn't use any drugs and... he drank occasionally." Broussard admitted that he did not believe the defendant did not use drugs. Following defendant's arrest, the police placed him in a holding cell and Broussard did not see defendant again until the confession was obtained.
Defendant took the stand to testify to the circumstances surrounding the confession. Defendant testified that he did "not really" recall seeing Detective Broussard before the pretrial hearings. The last thing he remembered was being at work on Friday, March 16, 1979 and "running up some preludin" in his arm. Although defendant could not remember exactly how many Preludins he had injected, he stated that it had to be ten or more since he "needed to do at least ten, fifteen ..." In addition defendant had no recollection of ever "having gone through an interrogation" or ever "having signed any written confession."
On cross-examination the prosecutor asked defendant:
"Q. Okay, you say you can't remember giving a statement or having any questions asked of you back in March of 1979. Are you saying you were not asked any questions, or are you just saying that today at this date and time you cannot remember being asked any questions about that woman?
A. What I'm saying is I can't recall nobody asking me questions. That's what I'm saying.
Q. So, in effect you could have been asked questions but you today just don't recall that?
A. That's what I'm saying, sir."
The prosecutor tried to define the limits of defendant's lapse of memory. Defendant responded that he had always had a memory problem. When pressed with a specific instance by the prosecutor, defendant remembered getting a DWI in September of the previous year and paying a fine, but he did not recall pleading guilty to the charge.
Following defendant's testimony, the state moved to introduce the confession. The trial judge ruled that since Detective Credeur had assisted Detective Broussard in the preliminary stages of obtaining the confession, he should have been called to the stand to bolster the confession predicate. Failure to do so, the court declared, rendered the confession inadmissible.
Immediately following this ruling, the state argued that the testimony of Detective Credeur was not necessary. However, in response to the trial court's ruling, the state requested time to bring Detective Credeur from the police station to testify. Defense counsel protested that to allow the state to call this witness was equivalent to permitting the state to bring back a witness after resting to prove an essential element of the case. Nevertheless, defense counsel agreed that the calling of this witness was within the judge's discretion. The trial judge allowed the state to call Detective Credeur as an additional witness.
After a brief recess, Detective Credeur testified that he met with defendant two times on March 18, 1979once at about 3:00 a.m. and later at about 5:00 p.m. Credeur was present when Broussard advised defendant of his Miranda rights. The prosecutor inquired whether defendant appeared to have any problem understanding, to which Credeur replied "[n]one whatsoever." Credeur described defendant as lucid, attentive and cooperative. At 3:00 a.m. defendant had divulged to Credeur that he had taken Preludins the previous afternoon and "still felt like he was having some *125 effects" from the drug. However, according to Credeur, defendant did not make a similar statement during the interview at 5:00 p.m. preceding the confession.
Defense counsel pursued the fact that defendant had admitted taking Preludins the preceding day. Credeur explained that the revelation occurred during a pre-test interview for a voice analyzer test. Consequently, the test was not run since the test is not administered to anyone under the influence of drugs. Credeur testified that no mention was made of the voice analyzer test when he again saw the defendant at 5:00 p.m.
When defense counsel probed Credeur about defendant's "inability" to answer questions at 3:00 a.m., Credeur corrected counsel noting that defendant "had a hesitancy to answer the questions," not "an inability to answer the questions." As time progressed the hesitancy subsided and at approximately 5:00 a.m., defendant admitted to Credeur that he had stabbed the victim. At the time of this admission Credeur felt that defendant "was coming down" from the drug. After the prosecutor assured the judge that no mention would be made of this oral inculpatory statement in the presence of the jury, the trial court ruled that the written confession was admissible.
In Assignment of Error No. 6, defendant contends that the trial court erred in permitting Detective Credeur to testify concerning the voluntariness of defendant's confession after the state had rested its case. Defendant argued that Credeur's testimony was not offered in rebuttal, but rather was offered in support of voluntariness and should have been introduced in the state's case-in-chief. The trial judge had determined that Detective Broussard's testimony alone was insufficient to carry the state's burden of admissibility of the confession.
C.Cr.P. 765 provides in pertinent part:
"The normal order of trial shall be as follows:
.....
(5) The presentation of the evidence of the state, and of the defendant, and of the state in rebuttal. The court in its discretion may permit the introduction of additional evidence prior to argument;..."
Generally, in the trial of criminal prosecutions, the state must put its whole case in evidence in its presentation in chief, and only rebuttal evidence should be reserved to meet the evidence adduced by the defense. State v. Nix, 327 So.2d 301 (La.1975), cert. denied, Fulford v. Louisiana, 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198 (1976); State v. Washington, 272 So.2d 355 (La.1973). This, however, was an evidentiary hearing to decide the admissibility of the confession during a recess in the trial while the jury was out of the courtroom during the state's case-in-chief.
We have never held that C.Cr.P. 765 applies to such hearings. The trial judge has great discretion in such matters. We have even approved the trial judge's permitting the state to reopen its case after resting. State v. Rhodes, 337 So.2d 207 (La.1976).
In Assignment of Error No. 7, the defendant challenges the trial court ruling that the confession was voluntary and therefore admissible.
Before a confession can be admitted into evidence, the state has the burden of affirmatively showing that it was made freely and voluntarily, and not influenced by fear, duress, intimidation, menaces, threats, inducements or promises. C.Cr.P. 703(C); R.S. 15:451; State v. West, 408 So.2d 1302 (La.1982); State v. Dewey, 408 So.2d 1255 (La.1982); State v. Jennings, 367 So.2d 357 (La.1979). Furthermore, if the statement was elicited during custodial interrogation, the state must show that the defendant was advised of his constitutional rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Petterway, 403 So.2d 1157 (La.1981); State v. Sonnier, 379 So.2d 1336 (La.1979).
Intoxication can render a statement involuntary if the intoxication is of such a *126 degree that it negates defendant's comprehension and renders him "unconscious of the consequences of what he is saying." State v. Vaccaro, 411 So.2d 415, 425 (La. 1982); State v. Kersey, 406 So.2d 555 (La. 1981); State v. Robinson, 384 So.2d 332 (La.1980); State v. Rankin, 357 So.2d 803 (La.1978). Whether intoxication exists and whether it is of a degree sufficient to vitiate the voluntariness of the confession are questions of fact. State v. Robinson, supra.
The admissibility of a confession is in the first instance a question for the trial judge, and his conclusions as to the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned on appellate review unless they are not supported by the evidence. State v. Kersey, supra; State v. Robinson, supra; State v. Hutto, 349 So.2d 318 (La.1977).
In the present case defendant confessed to Detective Broussard during custodial interrogation. Defendant was advised of his Miranda rights at least three times on March 18, 1979 prior to the time his written statement was taken at the police station.
The testimony of the two detectives was to the effect that, even if defendant had taken at least ten Preludins on Friday afternoon, March 16, he did not appear to be intoxicated over forty-eight hours later on Sunday at the time of the written confession. Both state witnesses described defendant as calm, lucid and attentive. Each officer specifically denied that defendant was ever threatened, intimidated or promised anything by anyone to give any type of statement. Defendant did not contradict the testimony and contend that he was mistreated. Rather he claimed no recollection of any confession and attributed his lapse of memory to the drugs he had taken Friday afternoon. Considering the description of defendant given by the detectives and the time which had elapsed since the drug was injected (approximately forty-eight hours), the trial judge did not err in ruling that the confession was voluntary.
The final assignment of error included in the argument (Assignment of Error No. 11) raises these same two issues, but in the context of a denial of a new trial motion based on these same grounds. The preceding discussion of Assignments 6 and 7 disposes of this assignment as well.
These assignments of error lack merit.

Argument No. 3 (Assignment of Error No. 9)
By this assignment defendant claims that the trial judge erred in admitting gruesome photographs of the victim at the conclusion of the state's argument for the imposition of the death penalty, thus diluting defendant's closing argument.
The photographs had been taken at the time of the autopsy of the victim and show the number and severity of the wounds inflicted upon her. During the guilt phase of the trial, Dr. Brierre, the forensic pathologist who performed the autopsy, described the wounds, their location and the probable manner in which each wound had been inflicted. Dr. Brierre testified from the photographs which previously had been marked for identification.
During the sentencing phase of the trial, the state recalled Dr. Brierre as its only witness. Again the physician referred to the photographs to point out the numerous stab wounds, their severity and the probable manner in which the wounds were inflicted. At the close of the doctor's testimony, the prosecutor asked that the photographs be introduced and that the jury be allowed to view them. Defense counsel requested that the pictures not be displayed to the jury until the conclusion of the sentencing hearing. The trial judge rejected this suggestion, commenting that the pictures had been offered at this point in the trial and he would permit the jury to view them now.
Defendant argues that if the state found it necessary to introduce the photographs, it would be logical to assume that the introduction would have been contemporaneous with the testimony of Dr. Brierre. Since they were not offered until the conclusion of the state's testimony, defendant surmised that the state feared that the jury would be distracted by the photographs and *127 would not pay proper attention to the testimony of the witness.
There is no merit to the argument. It has not been shown that the jury was in any way distracted. If there had been a distraction, defense counsel could have protected his client by objecting.
This assignment of error lacks merit.

Argument No. 4 (Assignments of Error Nos. 8b, 12 and 13)
By these assignments defendant contends that the trial court erred in denying his motion for a new trial based upon the failure of the sanity commission to abide by due process requirements, and on the "surprise" testimony at trial given by one of the members of the sanity commission.
On September 5, 1980 a sanity commission, consisting of Sidney J. Dupuy, M.D., a physician specializing in psychiatry, and Henry C. Voorhies, Jr., M.D., deputy coroner for Lafayette Parish, was appointed to determine defendant's mental capacity to proceed and his mental condition at the time of the offense. Both doctors notified the trial court that they had examined defendant pursuant to their appointments. Dr. Voorhies, in a letter dated September 22, 1980, reported that he found that defendant understood that he was charged with first degree murder, that he understood the "seriousness of said charges," and that he could "assist counsel in his defense." On February 3, 1981 Dr. Dupuy wrote to the court that he had examined defendant on January 16, 1981 and found him to be "cooperative." According to Dr. Dupuy, defendant answered questions readily, was able to give a chronological history, and exhibited no signs of any psychotic thinking. Dr. Dupuy also stated that he had interviewed defendant's mother and stepfather. They confided that defendant appeared the same since the time of the offense and "has had no behavioral changes nor any significant personality changes since the time of his aunt's death." In his opinion Dr. Dupuy felt that defendant was "able to understand the proceedings against him and able to assist counsel in his defense." He further concluded that defendant comprehended the difference between right and wrong and was able to adhere to the right.
During the guilt phase of the bifurcated trial, the state called Dr. Dupuy to testify concerning his examination of the defendant. The doctor testified that in his opinion defendant was able to understand the nature of the proceedings against him. Defendant "was aware that he was in jail and he was aware that these charges were `wrong charges.'" Dr. Dupuy also mentioned that defendant "denied any remembrance of the incident in question." Based upon the information available and upon defendant's appearance at the time of the interview, the doctor believed that defendant was in contact with reality and was mentally competent at the time of the interview. Upon further questioning by the prosecutor, Dr. Dupuy admitted that he felt that defendant was also mentally competent on March 17, 1979.
It is fundamental that a defendant without the capacity to understand the proceedings against him or to assist counsel in preparing a defense may not be subjected to trial. C.Cr.P. 641; State v. Holmes, 393 So.2d 670 (La.1981); Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).
The various criteria which should be considered in evaluating a defendant's capacity to stand trial were articulated by this court in State v. Bennett, 345 So.2d 1129, 1138 (La.1977):
"... Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense *128 include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial...."
The factors enumerated in State v. Bennett, supra, need not be explored in depth by the psychiatrists appointed to the sanity commission. Rather, these are guidelines to assist the courts in determining whether or not the defendant is presently capable of standing trial.
The defendant carries the burden of establishing that he lacks the capacity to understand the object, nature and consequences of the proceedings against him, and that he is unable, in a rational and factual manner, to consult with counsel in a meaningful way, and to assist in his defense. State v. Hamilton, 373 So.2d 179 (La.1979); State v. Weber, 364 So.2d 952 (La.1978).
In this case, a contradictory hearing was not conducted prior to trial to resolve the issue of defendant's mental capacity to proceed, as required by C.Cr.P. 647. Rather, the trial judge, the state and the defense proceeded to trial fully aware that a contradictory hearing had not been held. It appears that defense counsel had conceded prior to trial that defendant had the mental capacity to proceed. This fact alone would not necessarily be sufficient to deprive defendant of his right to a determination of his mental capacity to proceed. See State v. Bennett, supra.
In addition to the findings of the court appointed sanity commission, the defendant called to the stand at trial Dr. William A. Hawkins to testify to his mental capacity. This testimony was relevant to both his present capacity to proceed and his mental state at the time of the crime.
Dr. Hawkins, a clinical psychologist, administered a battery of psychological tests to the defendant.[1] The results of the Wechsler Adult Intelligence Test showed that defendant had a verbal IQ of 76 and a performance IQ of 65. On one of the sub-tests, vocabulary, defendant recorded an IQ of 91, while on the arithmetic sub-test his IQ registered at 63. The variability on the various sub-tests indicated that at one time defendant functioned at a higher IQ level, but that something had happened to decrease his overall ability.
The doctor testified that he arrived at several basic conclusions about the defendant as a result of the various tests and the previous history of the defendant. Defendant had an inadequate personality and had turned to substance abuse which had affected his intellectual ability but not his neurological system at this point; defendant was experiencing neurotic depression relating to his condition; defendant had not learned to cope with his problems; and defendant's intellectual ability had decreased from low-average to borderline level. On cross-examination, Dr. Hawkins admitted that defendant would eventually function at a higher level if he used no drugs or alcohol for a period of time.
At the hearing on defendant's motion for a new trial, the trial judge ruled that defendant had waived the issue of his competency to stand trial because he had not filed a motion for a pretrial contradictory hearing and had not insisted on the hearing prior to trial. By starting trial, the defendant admitted that he was ready to start the trial and was able to assist his counsel.
Defense counsel argued that it was not incumbent upon defendant to ask for the *129 contradictory hearing once he had filed the motion for appointment of the sanity commission since defendant should be able to rely upon the law being followed. However, the trial judge responded that a defendant should not be allowed to stand back and not insist on the contradictory hearing, thereby setting up grounds for a new trial.
In making his ruling, the judge commented:
"The Court is satisfied that defendant effectively and knowingly waived the contradictory hearing required by Article 647, not only in conferences among the counsel for defendant, State, and the Court, though those conferences are not recorded in the minutes of the trial, and also by consenting to proceed to trial without objection, his having full knowledge that the reports of the doctors appointed to the Sanity Commission were to the effect that the defendant had the capacity necessary to go to trial. The Court's recollection, again though not in the record, is that defendant's capacity to stand trial was conceited (sic) by defense counsel in these conferences. Is my recollection correct ...?"
In response to the judge's question, defense counsel replied: "That's the way I recall it, Your Honor."
Finally, the judge in denying this ground as a basis for a new trial reflected:
"This issue is for the Court, and had the Court, or this Court, been called upon to decide this issue, the Court would have held that the defendant did and does have capacity to stand trial. And that is based on the evidence on the issue heard during the trial."
The letters furnished by the members of the sanity commission, along with the testimony at trial of Drs. Dupuy and Hawkins, were sufficient for the trial judge to make a determination of the defendant's mental capacity. Dr. Hawkins established that defendant was operating at a borderline level of mental retardation at the time he examined him in February, 1981. However, the decision as to defendant's competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case and the gravity of the decisions with which he is faced. State v. Bennett, supra.
The lack of a contradictory hearing in this case is harmless. The decision as to capacity to proceed rests with the trial judge. The judge read the letters furnished by the sanity commission prior to trial. At trial he heard testimony from one of the doctors on the commission and from another doctor furnished by the defense. In addition, it appears that the issue of a contradictory hearing had been discussed by the judge and the two attorneys prior to trial and it was conceded that defendant possessed the requisite capacity to proceed.
The commission doctors did in fact examine defendant and report their findings to the trial court before trial, even though no contradictory hearing was held. Based on these findings and the evidence on the issue of sanity adduced at trial, the trial court made a determination that defendant had the capacity to stand trial. The trial judge did not abuse his discretion in finding the defendant mentally competent at the time of trial.
Defendant also contended that the trial court erred in denying his motion for a new trial based upon the admission of the testimony of Dr. Dupuy, relating to his sanity at the time of the commission of the offense. The disputed testimony was as follows:
"Q. Now, you're saying it was your opinion from your discussions with him and the other information you may have used that you felt that he was mentally competent on March 17, 1979?
A. You could never say definitely, but it is my opinion that he was."
The defense counsel did not object to the doctors's testimony until the state had completed its questioning of the doctor. Then the defense counsel objected to the entire line of testimony reasoning that "this particular issue is something that must be raised prior to trial. The issue is insanity at *130 the time of the offense. What the doctor has testified is as to that, as well as sanity at present. The former issue is something that must be determined in advance of trial, however; and I request that the Judge admonish the jury with an explanation of the same." The trial judge sustained the objection as to sanity at the time of the examination as "being immaterial and irrelevant." Defense counsel then explained that his objection ran to the doctor's findings on defendant's sanity at the time of the offense. The trial court overruled the defendant's objection on this point.
The defendant pleaded not guilty and not guilty by reason of insanity. C.Cr.P. 552. This plea presented for the jury's consideration the accused's sanity at the time of the offense. C.Cr.P. 816; State v. Berry, 324 So.2d 822 (La.1975), cert. denied, Berry v. Louisiana, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976). Since a defendant is presumed sane and bears the burden of proving his insanity (R.S. 15:432), the state is not required to offer proof of sanity (State v. Roy, 395 So.2d 664 (La. 1981). But any testimony relating to defendant's sanity at the time of the commission of the offense was admissible and was not a "surprise" to defendant, as he argues.
These assignments of error lack merit.

Argument No. 5 (Assignment of Error No. 15)
By this assignment of error, defendant contends that the trial court erred in denying his motion to arrest judgment based upon the invalidity of the statute under which the offense was charged and also a defective verdict. Defendant set out his reasons in his written motion to arrest judgment:
"Under the 1979 first degree murder statute, the statute under which this prosecution is based, the death penalty may be imposed where there is a killing with specific intent to do great bodily harm or to kill, and there is no requirement of any felony-murder circumstance. In contrast, at the time of trial, in 1981, the first degree murder statute required, in order to impose the death penalty, that the defendant meet certain specified criteria, felony-murder among them, all of which circumstances are aggravating and indicate a severity above and beyond the requirements of the 1979 statute. Defendant was tried under the 1979 statute, and the facts alleged to be proved and demonstrated did not involve felony-murder. Accordingly, the defendant should not be subjected to a jury recommendation of the death penalty, because to warrant the same, defendant must be held to a higher moral degree of culpability than was the case in 1979. Defendant should be given the benefit of the legislative desire and the benefit of the reduced penalty of life imprisonment."
On March 17, 1979, the date of the offense, first degree murder was defined as "the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm." R.S. 14:30 as enacted by Acts 1976, No. 657. The statute did not specify that the killing had to be committed during the course of a particular crime, such as armed robbery. In 1979 the legislature again amended the first and second degree murder statutes. First degree murder was defined to be "the killing of a human being: (1) when the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery ..." R.S. 14:30 as enacted by Acts 1979, No. 74. (Emphasis added). A murder with specific intent to kill, without any further qualification, became second degree murder with a penalty of life imprisonment and no exposure to the death penalty.
It is well settled that a defendant is to be tried under the statute in effect at the time of the commission of the crime. The mere fact that a statute may be subsequently amended, after the commission of the crime, so as to modify or lessen the possible penalty to be imposed, does not extinguish liability for the offense committed under the former statute.
R.S. 24:171 provides:

*131 "The repeal of any law shall not have the effect of releasing or extinguishing any penalty, forfeiture or liability, civil or criminal, incurred under such law unless the repealing act expressly so provides, and such law shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability."
"The repeal, re-enactment, or amendment of a penal statute does not extinguish or alter the liability for penalty of the former statute, unless the legislature so intends...." State v. Paciera, 290 So.2d 681, 687 (La.1974).
In this case the 1979 amendments to the first and second degree murder statutes did not include a provision releasing or extinguishing the liability or penalty under the former statute. An aggravating circumstance was not an essential element of first degree murder at the time of the instant defense (see State v. LaFleur, 398 So.2d 1074 (La.1981), although armed robbery was one of the aggravating circumstances essential to a death sentence under C.Cr.P. 905.4. Defendant was properly convicted under the 1976 first degree murder statute in effect at the time of the commission of the crime.
This assignment lacks merit.

Assignments neither briefed nor argued
Assignments of error neither briefed nor argued are generally considered abandoned. State v. Lindsey, 404 So.2d 466 (La.1981). However, in cases where the death penalty is imposed this court reviews assignments of error not briefed as a matter of policy. State v. Lindsey, supra; State v. Monroe, 397 So.2d 1258 (La.1981).

Assignments of Error Nos. 1 and 2
By these assignments defendant contends that (1) the trial court erred in excluding prospective jurors who voiced general objections to the death penalty and that (2) trial counsel was incompetent in not objecting to the court's exclusion of the jurors.
"In Witherspoon [Witherspoon v. Illinois, 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776] (1968)], the United States Supreme Court held that a death sentence cannot be constitutionally carried out if the jury that recommended it was chosen by excusing members of the venire for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. Rather, imposition of the sentence would only be proper if such a juror was excused because he made it unmistakably clear (1) that he would automatically vote against the death sentence regardless of the evidence or (2) that his attitude toward the death penalty would prevent him from rendering an impartial verdict in the guilt phase of the prosecution...." State v. Lindsey, supra at 477.
Under C.Cr.P. 798(2), the state may challenge for cause a juror who has conscientious scruples against the death penalty and who makes it "unmistakably clear ... that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him...." This article is constitutionally valid. State v. Monroe, supra.
Each of the seven prospective jurors excused indicated that he would not consider imposition of the death penalty under any circumstances, regardless of the facts presented at trial. Some of the jurors even expressed doubts about being able to render an impartial verdict on the issue of guilt or innocence in the face of a possible death penalty for the defendant. The trial judge held the jurors to the Witherspoon standard that jurors may not be excluded merely because they voice general objections to the death penalty or express scruples against its infliction. Under the circumstances, the trial court did not err in excluding the challenged jurors and defense counsel was not incompetent for not objecting when there was no basis for an objection.
These assignments of error lack merit.

*132 Assignment of Error No. 3

In his third assignment of error, defendant contends that the trial court erred and defense counsel was incompetent in permitting Detective Broussard to remain in the courtroom throughout the course of the trial in violation of a sequestration order.
Prior to the prosecutor's opening statement, defense counsel moved that all state witnesses be placed under the rule of sequestration. At the close of the examination of Detective Broussard, the prosecutor informed the witness that he had no further questions. The trial judge told the witness "[y]ou may step down," but did not advise the witness that he was still under the rule of sequestration. Earlier in the trial, while examining Dr. Voorhies relative to a blood sample the doctor had drawn from defendant, the prosecutor asked, "And after you drew the blood sample from Mr. Narcisse you would have given it to Detective Broussard, the man seated at the table over there?" Apparently, these two incidents form the basis for defendant's contention that Detective Broussard "remain[ed] in the courtroom throughout the course of the trial to assist the State of Louisiana."
The sequestration rule is contained in C.Cr.P. 764:
"Upon its own motion the court may, and upon request of the state or the defendant the court shall, order that the witnesses be excluded from the courtroom or from where they can see or hear the proceedings and refrain from discussing the facts of the case or the testimony of any witness with anyone other than the district attorney or defense counsel. The court may modify its order in the interest of justice."
The purpose of this article is to prevent witnesses from being influenced by the testimony of earlier witnesses and to strengthen the role of cross-examination in developing the facts. The trial judge, in his discretion, may determine the disqualification of a witness when a rule of sequestration has been violated. State v. Stewart, 387 So.2d 1103 (La.1980); State v. Mullins, 353 So.2d 243 (La.1977).
Detective Broussard was one of the policemen who investigated the crime. As such, he testified to the condition of the crime scene when he arrived shortly after the body was found. Broussard was the officer who learned that defendant's car had been spotted at the victim's house the morning of the crime, and who was later given permission to search the defendant's house. Broussard also obtained the confession from defendant.
In this case the witness testified to events, some of which were the subject of prior testimony of other witnesses. Detective Broussard's testimony primarily focused on his investigation of the defendant's residence and the taking of defendant's confession. Earlier in the trial proceedings Officer Larry Mire had testified about the scene of the murder and the discovery of the victim's body. Even though Broussard might have overheard Officer Mire's testimony, Broussard should not have been swayed by this testimony since he testified to different aspects of the crime scene. Officer Mire was preoccupied with sketching the crime scene in his capacity as crime scene technician, and in taking photographs. Detective Broussard, on the other hand, briefly testified about his inspection of the victim's house. He was examined in greater detail about his search of defendant's residence, on which there was no prior testimony.
In addition, other witnesses did not testify concerning the actual taking of defendant's confession; Detective Broussard could not have been influenced by prior testimony. Detective Credeur who spoke with defendant immediately before the taking of the confession testified after Detective Broussard took the stand; Broussard could not have been influenced by his testimony.
Under these circumstances defendant was not prejudiced by the presence of Broussard in the courtroom.
This assignment of error lacks merit.

Assignments of Error Nos. 5 and 10
By these assignments defendant contends that the trial court committed error in denying *133 a mistrial, and later a new trial, by allowing the state to show inflammatory evidence to the jury before the items were contemporaneously admitted into evidence and before a chain of custody and proper foundation had been established. In Assignment of Error No. 10 defendant refers in particular to a bloody pillowcase.
Charles S. Andrews of the Louisiana State Police Crime Lab testified that he was called upon to compare shoe prints on pieces of carpeting, floor material and the pillowcase to the soles on a pair of shoes. The prosecutor showed the witness two rug remnants and a package containing two canvas type shoes. He asked the witness if these were the same ones that he had examined and further requested that the witness elaborate on the examination that had been conducted. After the witness explained the testing that was done, the prosecutor attempted to have the pillowcase marked for identification. Defense counsel objected, noting that the pillowcase had not been previously introduced into evidence and no testimony should be taken until the proper foundation had been laid. Defense counsel noted that the jury had viewed the items, specifically the bloody pillowcase, and obviously did not presume that there was "chocolate" on it. The trial judge sustained the objection, admonishing the jury "not to consider the evidence that was sought to be introduced, to be discussed."
Later, based upon this same incident, defense counsel moved for a mistrial. The trial judge denied the motion, observing that no evidence was adduced after the objection was made and that he had previously admonished the jury not to regard any of the testimony.
Mistrial is a drastic remedy and, unless mandatory, is committed to the sound discretion of the trial judge.[2] C.Cr.P. 770; State v. Tribbet, 415 So.2d 182 (La. 1982). It is only warranted if substantial prejudice results which would deprive defendant of a fair trial. State v. Tribbet, supra; State v. Sepulvado, 367 So.2d 762 (La.1979). The trial judge is granted discretion to determine whether a fair trial is impossible, or whether an admonition is adequate to assure a fair trial when prejudicial conduct does not fit within the mandatory mistrial provisions of C.Cr.P. 770. State v. Belgard, 410 So.2d 720, 724 (La. 1982). The ruling will not be disturbed on review absent an abuse of discretion. State v. Alexander, 351 So.2d 505 (La.1977); State v. Haynes, 339 So.2d 328 (La.1976).
Based on Mr. Andrews' testimony, the items do not appear to have been nearly so "inflammatory" as defendant contends. Mr. Andrews noted that "the marks [had] faded a lot" on one of the rugs. In regard to the other piece of rug, the witness testified: "I don't even see the marking, the shoe pattern must have faded completely off of this one. I don't even see it any more." Later, he mentioned that the patterns were "really weak now." Based on these circumstances, the trial judge correctly determined that an admonition was sufficient in this case. The harsh remedy of mistrial is not justified when an admonition will preserve the defendant's rights. State v. Belgard, supra; State v. McMahon, 391 So.2d 1120 (La.1980).
These assignments of error lack merit.

*134 Assignments of Error Nos. 8(A) and 14

By these assignments defendant contends that the trial judge erred in overruling his motion to suppress items taken from his home and in denying his new trial motion based upon the admission of this evidence.
When the state sought to introduce into evidence items which had been seized without a warrant from defendant's house, defense counsel objected, stating that it had come to his attention that the person granting permission to search was not a full-time resident of the house and therefore incapable of giving valid consent. The trial judge denied the tardy motion to suppress, relying upon C.Cr.P. 703 which requires that a motion to suppress evidence be filed in advance of trial unless the grounds for the motion are unknown.
The consent to search was given by Joseph Shelvin who told Detective Broussard that he resided at the house in which defendant lived.[3] Defendant argues that Mr. Shelvin resided there only part of the time and therefore could not constitutionally give consent to search the house.
Under C.Cr.P. 703, defendant must file a motion to suppress physical evidence prior to trial. In the instant case, defense counsel sought to file a belated motion, claiming that he had just learned that Mr. Shelvin resided at the house on a part time basis. C.Cr.P. 703 only allows a late filing of a motion in the case where an opportunity for a timely filing did not exist or where "... neither the defendant nor his counsel was aware of the existence of the evidence or the ground of the motion ..."
The state answered defendant's discovery motion putting defendant on notice that the state had physical evidence. The state responded that the defendant was allowed to inspect any documents or articles within its control or "in the hands of the respective agencys (sic) in whose custody said evidence is presently entrusted." Thus defendant was entitled to access to the written permission to search form signed by Joseph Shelvin at 3:55 a.m. on March 18, 1979. In addition, defendant knew who resided at his house with him. Consequently, the trial judge did not err in denying the motion to suppress or the later motion for a new trial.
These assignments of error lack merit.

Assignment of Error No. 16
By this assignment defendant contends that the evidence of mitigating factors outweighed the aggravating circumstances and therefore life imprisonment is the appropriate remedy.
During the sentencing phase of the trial, the only witness called by the defense was the defendant himself. The extent of defendant's testimony was his age (twenty-three) and the fact that he had no prior criminal record.
In his closing argument to the jury defense counsel rhetorically asked the jury whether a young man would enter the house of his great-aunt and stab her with such violent force that it would result in a corpse mutilated in the manner shown in the photographs introduced by the state in the sentencing phase of the trial. Counsel then answered the question in the negative, that a young man "doesn't stab a 74-year-old woman to take food coupons and leave." Defense counsel stressed the testimony of defendant during the guilt phase of the trial relating to his drug usage. He also called the attention of the jury to the testimony of defendant's ex-wife who, although a witness for the state, nevertheless observed that it was strange that defendant worked but never brought home any money.
Defense counsel argued that the victim suffered minimal pain even though the photographs would seem to indicate otherwise. In referring again to the photographs, counsel noted that they would prove to "any reasonable man that the man who cut that woman up was not in his right mind."
Counsel reminded the jury of the testimony of defendant's mother during the guilt *135 phase of the trial that defendant had exhibited deviant behavior since the death of his father in 1970.
In summation, the factors argued in mitigation were defendant's age, his first offender status, his drug usage, the minimal pain suffered by the victim and his history of deviant behavior.
The jury found the presence of two aggravating circumstances: the killing occurred during an armed robbery and the killing was accomplished in a particularly heinous manner.
Although defense counsel argued that the robbery only netted an old billfold and a few food coupons, the fact remains that an armed robbery took place. The jury had already rejected the defense that the defendant lacked criminal culpability because he was under the influence of drugs at the time of the offense. The photographs of the victim portray that the victim was in the words of defense counsel "carv[ed] ... up like hamburger meat."
The finding of the jury that the killing was committed during an armed robbery was sufficient to outweigh the mitigating factors presented by the defendant.
This assignment of error lacks merit.

Assignment of Error No. 17
By this assignment defendant contends that the trial court erred in concurring with the recommendation of the jury in the death sentence since the sentence is disproportionate when compared to penalties imposed in similar cases tried in the region.
This assignment will be discussed in the sentence review section of this opinion.

Assignment of Error No. 18
By this assignment defendant contends that the trial court erred in sentencing him before it had received and reviewed the sentence investigation report.
The jury in the instant case unanimously recommended that defendant be sentenced to death. According to C.Cr.P. 905.8, "[t]he court shall sentence the defendant in accordance with the recommendation of the jury." (Emphasis added). The judge has no discretion in sentencing once the jury unanimously recommends death. Accordingly, the judge did not err in imposing the sentence before he had received the report.
This assignment of error lacks merit.

SENTENCE REVIEW
At the conclusion of the sentencing hearing, the jury returned a unanimous recommendation that the defendant be sentenced to death. On June 22, 1981 defendant was sentenced to death.
Article 905.9 of the Code of Criminal Procedure mandates that every sentence of death be reviewed to determine if it is excessive, and that this court "by rules shall establish such procedures as are necessary to satisfy constitutional criteria for review." Supreme Court Rule 28 (which appears as C.Cr.P. 905.9.1) provides:
"Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
In compliance with Supreme Court Rule 28, § 3, the trial judge submitted a Uniform Capital Sentence Report. The report indicates that defendant is a twenty-three year old divorced black male with one child whom he does not support. Defendant, a poor student, left high school at the end of the tenth grade.
Defendant's parents were married, but defendant lived with his grandparents from age two months until his marriage at age twenty-one. According to his mother, defendant was close to his father and began having serious emotional problems after his father's death in 1970. Defendant became *136 a drug user at an early age, approximately twelve years old.
Defendant suffers vision loss from iritis, a serious inflammation of the eye. His loss of vision was apparently a contributing factor to his erratic work history. The defendant's mother explained that it was very difficult for her son to hold a job because of problems with his eyes.
The victim was defendant's seventy-four year old great-aunt who had been friendly with him. Her nieces described the victim as "a very lovable woman who intensely cared for the offender."
Psychological testing revealed that defendant had an inadequate personality and was functioning at a borderline level of mental retardation. The tests indicated that defendant's IQ had been substantially greater at some period in the past. The reduced IQ was attributed to the defendant's heavy drug usage.
At trial there was psychiatric testimony that defendant knew the difference between right and wrong and was able to adhere to the right.
Although he confessed to the murder on March 18, 1979, at trial defendant testified that he had no recollection of the events of the day of the murder. This same memory lapse was related to the officer preparing the Sentence Investigation Report.

PASSION, PREJUDICE AND ARBITRARY FACTORS
The defendant contends that the death sentence was imposed under the influence of passion, prejudice or other arbitrary factors attributable to improper and inflammatory remarks made during the prosecutor's closing argument to the jury at the sentencing hearing.
Argument of counsel is governed by C.Cr.P. 774, which provides:
"The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant."
This court has defined the scope of such argument:
"... The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict...." State v. Hayes, 364 So.2d 923, 926 (La.1978).
C.Cr.P. 774 is applicable to capital sentencing procedure by virtue of C.Cr.P. 905.2 which adopts, insofar as they are applicable, the general provisions of the Code of Criminal Procedure as the procedure to be followed during the sentencing phase of the bifurcated trial. State v. Lindsey, supra.
While this court may look to art. 774 to determine if argument was improper, in reviewing whether it is reversible error, it must determine whether the argument introduced passion, prejudice or any other arbitrary factor into the proceedings which contributed to the jury's recommendation of the death penalty. State v. Lindsey, supra.
In the present case the prosecutor asked the jury that they "in all essence really just disregard all this evidence about the drug addict business. There's nothing; that's not a mitigating factor."
Earlier in the argument the prosecutor reminded the jury that:
"... Every day we always read in the paper about someone else being shot, someone else being killed, the crime rate, people clammering (sic) about what is going to be done about the crime rate, what's going to be done about this. If people write in, and they always say, well, we need to get stiffer with the criminals. The courts are letting them off with nothing. They get out on probation. They get out on parole. We're afraid. We're baby coddling. Well, you *137 as jurors have the chance now to stand up and say we're not going to do that. It is a tough decision but it's got to start somewhere. As the old saying goes, the buck stops here and in this case it stops in this jury box. If you can't after looking at all the facts, after considering all of the evidence, after considering those photographs, after considering everything that has gone on in this courtroom in the last three days, if you can't justify the death penalty in this case, then do we have any room to complain about our crime situation?"
Later, the prosecutor stressed the deterrence function of the death penalty:
"... The State asks for the death penalty because we feel that this is one of those cases that warrants it. In addition, we feel that it is time that this community and the people in it tell the ones who are going around committing crimes that we're not going to play with this any more. From now on we're going to deal with it harshly, as harshly as you deal with your victims. That is what we're going for. As a warning or as a statement to the criminal element in our society that you'll no longer be received with kid gloves and red carpet treatment when you come to the courthouse. If it deters the killing of one human being then it has served a purpose. Society will have received the goal it is seeking, to try to eliminate or eradicate crime. We may never do it but if we don't start somewhere, then where do we start? We can always push it to the back and try to put the blame on someone else, the court system, the lawyers, technicalities, stuff like that. But as I said before the buck stops here. You can no longer blame it on technicalities. You can no longer blame it on the court system because the court system at this point is you and you have to make the decision."
At no time did defense counsel lodge an objection to the content of this closing argument. Ordinarily, this court would find that the issue had not been preserved for review. C.Cr.P. 841. However, since this is a capital case, the obligation to examine the record for passion, prejudice or arbitrary factors which might have contributed to the death penalty recommendation requires a review of the prosecutor's argument for possible reversible error. State v. Lindsey, supra.
In brief, defendant now argues that the cumulative effect of the prosecutor's argument infected the penalty verdict with arbitrariness, prejudice and passion. The argument is well made, but is without real substance. An intelligent jury could not reasonably have believed that the prosecutor was urging them to ignore the law and base their decision simply on their emotional response to the crime. State v. Monroe, supra.
The prosecutor argued that: drug addiction should not be considered a mitigating factor in this crime; the death penalty was justified because of its deterrent effect; the responsibility of the jury was serious; and that this particular crime justified the imposition of the death penalty. The argument did not appeal to prejudice. There was no appeal to passion. There was no introduction of arbitrary factors which might have tainted the verdict.

AGGRAVATING CIRCUMSTANCES
The jury found the existence of two aggravating circumstances: the offense was committed during an armed robbery and the killing was done in an especially heinous, atrocious or cruel manner.
The evidence fully supports the finding that defendant stabbed his great-aunt during the course of an armed robbery. In his confession defendant admitted taking the victim's wallet from her purse. The wallet was discovered in a brown paper bag in a garbage can at defendant's home. The bag also contained the knife identified as the murder weapon, thus leading to the conclusion that the wallet was stolen at the time of the murder.
The coroner testified that the victim had been stabbed sixteen times, mostly in the head and neck area. Several of these wounds were of sufficient severity to have *138 independently caused the victim's death. There were deep lacerations on the left side of the face, neck, shoulder and scalp. The doctor pointed to wounds where tissue had been lost because the knife was removed at a different angle than the one at which it entered the body. The coroner noted particularly that wounds to the heart and the one severing the aorta were inflicted at a time when the victim had already lost a great amount of blood. This conclusion was reached because there was minimal bleeding from these punctures which would ordinarily be expected to bleed profusely. He suggested that these later lacerations may have been inflicted to halt the victim's groaning. The coroner estimated that the victim might have lived for about five minutes after the first blow was inflicted, but was probably unconscious about a minute after the attack. In addition to the lacerations, the victim was bruised and swollen, which indicated that a struggle had taken place. There were also multiple blunt indentations on the face of the victim which represented blows "from either the opposite, the non-cutting portion of the blade or fingernails possibly."
In the instant case, many of the cuts and lacerations were described as potentially fatal. The victim suffered a broken hip when she fell from the force of the attack. Defendant administered the final wounds with such force that the victim's ribs were broken. The attack apparently came without warning, by a young and trusted kinsman the victim had befriended, whose object was his aged great-aunt's money.
Because death was apparently quick, and because there was no additional evidence of an intention to torture, it could be argued that the crime, although vicious, brutal and treacherous, was not committed in an "especially heinous, atrocious or cruel manner." In the past, this court has divided on the "heinous" nature of stabbing and cutting offenses. See State v. Taylor, 422 So.2d 109 (La.1982); State v. Culberth, 390 So.2d 847 (La.1980).
Here, it is unnecessary to decide whether this crime was "merely" heinous, atrocious or cruel, or whether it was "especially" heinous, atrocious or cruel. Because there was clear proof of one aggravating factor, even if the jury erred in finding another, the error is harmless.
It is unnecessary for both aggravating factors found by the jury to be present. State v. Moore, 414 So.2d 340 (La.1982); State v. Monroe, supra.
"Where two or more statutory aggravating circumstances are found by the jury, the failure of one circumstance does not so taint the proceedings as to invalidate the other aggravating circumstance found and the sentence of death based thereon...." State v. Monroe, supra at 1276.
Since the evidence was sufficient to support one of the aggravating circumstances, the sentence imposed by the jury will not be set aside.

PROPORTIONALITY OF SENTENCE
The purpose of the proportionality inquiry is to determine "whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Supreme Court Rule 28, § 1(c); State v. Monroe, supra. An inference of arbitrariness arises when a jury's recommendation is inconsistent with sentences imposed in similar cases from the same jurisdiction. State v. Sonnier, 380 So.2d 1 (La.1979).
The Sentence Review Memorandum submitted to this court by the Lafayette Parish District Attorney's Office shows that there have been four prosecutions for first degree murder in Lafayette Parish since January 1, 1976. Only in the present case did the jury recommend the death penalty.
State v. Aucoin, 362 So.2d 503 (La.1978), involved the murder of an eight year old girl by her mother. The crime was committed by stabbing, strangling, beating and ultimately driving over the victim with an automobile. The state argued that the crime was committed in an especially heinous manner, while the defendant claimed *139 mental disease and drug addiction. The defendant was twenty-six with no prior criminal record. The defendant had been released from Central Louisiana State Hospital less than a year before the crime, having been diagnosed as suffering from depression neurosis and drug dependence. The jury recommended life imprisonment.
In State v. Thibeaux, 366 So.2d 1314 (La. 1978), after convicting the defendant of first degree murder, the jury returned a recommendation of life imprisonment. This court reversed the conviction of the defendant for the murder of her husband because the trial court improperly restricted testimony regarding the violent acts of the victim against the defendant. Defendant was a thirty-nine year old black female with four children. During the trial, the state offered no evidence of aggravating circumstances.
In State v. Francis, 403 So.2d 680 (La. 1981), this court affirmed the convictions of the defendant for two counts of first degree murder based upon an altercation in a lounge. The defendant noticed his former girl friend dancing with another man and shot him. The security guard located on the premises tried to calm the disturbance and pulled his gun, firing at the defendant. Defendant then shot and killed the security guard. The state argued that the defendant knowingly created a risk of death or great bodily harm to more than one person. Defendant received a sentence of life imprisonment for the crimes.
This is the first sentence of death rendered by a Lafayette jury in the fifty years prior to this prosecution. Of the three cases occurring within the time period embraced by the court rule, State v. Aucoin, supra, was perhaps a more shocking crime; State v. Francis, supra, involved the shooting of two men; in State v. Thibeaux, supra, there was a strong claim of self-defense.
If the review of proportionality is limited to cases in Lafayette Parish, the sentence in this case can only be compared with the sentence in the Aucoin case (life imprisonment), because the known facts in the two cases show a great similarity. A review of cases from other parishes, however, will justify the death sentence.
In State v. Clark, 387 So.2d 1124 (La. 1980), the victim was stabbed thirty to thirty-five times in the back, neck, head, arms and hands. An East Baton Rouge Parish jury sentenced the defendant to death, finding that he was engaged in the perpetration or attempted perpetration of an armed robbery and also that the offense was committed in an especially heinous, atrocious or cruel manner.
In State v. Monroe, 397 So.2d 1258 (La. 1981), the defendant broke into the victim's home in Orleans Parish and stabbed her seven times. This court affirmed his conviction and death sentence.
In State v. Moore, 414 So.2d 340 (La. 1982), the victim suffered thirteen stab wounds, seven of them potentially fatal. This court upheld the Bossier Parish jury's sentence of death. But see, State v. Gaskin, 412 So.2d 1007 (La.1982).
In State v. Taylor, 422 So.2d 109 (La. 1982), a Jefferson Parish jury unanimously recommended the death penalty, finding two aggravating circumstances. In that case, the victim was stabbed over twenty times, and was found stuffed in the trunk of his car. But see State v. Sharp, 418 So.2d 1344 (La.1982).
Considering both the crime and the defendant in the instant case, the death sentence is not disproportionate to sentences imposed in similar stabbing cases. Proportionality review is a safeguard against excessive sentences imposed because of arbitrary action by a jury. The jury in the instant case did not act arbitrarily in comparison with other juries in similar cases in recommending the death penalty.

DECREE
The conviction and sentence are affirmed.
WATSON, J., concurs and assigns reasons.
*140 WATSON, Justice, concurring.
I concur in the affirmation of the conviction and sentence in this case. However, I disagree with the majority that there is "great similarity" between this case and State v. Aucoin, 362 So.2d 503 (La., 1978) and the subsequent consideration of cases from other jurisdictions as to proportionality.
The Aucoin case involved the murder of a young girl by her mother. The relationship of the parties alone is sufficient to distinguish Aucoin from Narcisse, where the youthful defendant murdered his seventy-four year old great-aunt. There are no other death sentence cases reported from Lafayette Parish and as a consequence there can be no realistic review as to proportionality. Nevertheless, the sentence is in keeping with the circumstances of the crime and should be affirmed.
For these reasons, I respectfully concur.
NOTES
[1] Dr. Hawkins testified that he "administered an adult intelligence test, ... gave a Bender-Gestalt test, handwriting specimen, memory for designs test, projective drawings, Rorschach test, which is a personality test, obtained somewhat of a history and did a clinical interview."
[2] C.Cr.P. 770 contains the mandatory grounds for mistrial:

"Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial."
[3] Mr. Shelvin is married to the mother of defendant's ex-wife. Defendant and his ex-wife had resided with the family having a bedroom and bathroom assigned to them.